**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CASEY D. WHITE, | |
| Plaintiff, | CIVIL ACTION NO. 3:04-CV-1523 |
| v. | (JUDGE CAPUTO) |
| THE CONTINENTAL INSURANCE COMPANY, *et al.*, | |
| Defendants. | |

**MEMORANDUM**

Presently before the Court are Defendant Continental Insurance Company's Motion for Summary Judgment (Doc. 14) and Great Northern Insurance Company's Motion for Summary Judgment (Doc. 16). Following oral argument on the motions and for the reasons set forth below, Continental Insurance Company's motion will be granted and Great Northern Insurance Company's motion will be denied. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441(a).

**FACTUAL BACKGROUND**

On August 17, 2001, Casey White sustained bodily injuries in a motor vehicle accident while a passenger in a 1996 Jeep Cherokee ("vehicle"). (Doc. 12 ¶ 1.) The vehicle was owned by Robert and Regina Euler ("the Eulers"). (Doc. 12 ¶ 3.) However, at the time of the accident, the vehicle was being operated by Michael Ahearn. (Doc. 12 ¶ 4.)

   a.   **The Insurance Policies**

At the time of the accident, Michael Ahearn, who resided with his parents Michael

1

and Joanne Ahearn, was insured under a primary automobile insurance policy issued by Great Northern Insurance Company ("Great Northern").  The policy provided $500,000 of initial liability coverage.  In addition, Great Northern's policy had an "Other Insurance" provision that states:

> **Vehicles:** When other liability insurance applies to covered damages, we will pay our share.  Our share is the proportion that the amount of coverage under this policy bears to the total of all applicable amounts of coverage.  However, for non-owned motorized land vehicles, this insurance is **excess over any other insurance**, except that written specifically to cover excess over the amount of coverage in this policy.

(Doc. 13, at 000206) (emphasis added).

Meanwhile, the Eulers were insured under a USP Deluxe Package insurance policy issued by Continental Insurance Company ("Continental").  The USP Deluxe Package provided the following pertinent coverage: (1) primary automobile insurance with $250,000 of liability coverage; and (2) Optional Excess Liability Coverage in an amount of $2.5 million.  (Doc. 13, at 000031-34).

The Optional Excess Liability Coverage Endorsement ("Excess Coverage"), which provides excess liability coverage of $2.5 million, uses the following language to define the coverage provided:

> **EXCESS LIABILITY COVERAGE**
>
> **Insuring Agreement**
>
> We will pay damages . . . up to the limit of liability shown in the Coverage Summary for "Optional Excess Liability".  Any payment is subject to the *minimum retained limit* . . .and the other provisions of this endorsement.
>
> \* \* \*

2

**Limit of Liability**

You must maintain *underlying insurance* for each exposure shown in the Coverage Summary for "Optional Excess Liability", with not less than the liability limits shown in the *Minimum Retained Limit* definition. Except as provided in Provision 3, **Self Insured Retention**, under the **General Provisions Optional Excess Liability Coverage Endorsement**, we will pay only the difference between:

1. The *Minimum Retained Limit* amount shown in the Coverage Summary; and

2. The total of what you legally have to pay;

and in no case more than the limit shown in the Coverage Summary for "Optional Excess Liability".

NOTE:  The *Minimum Retained Limit* will be satisfied in regard to any exposure(s) for which you maintain the *underlying insurance* as part of [the Continental Policy] with which this endorsement is issued.

(Doc. 13, at 000123) (emphasis in original).  "Minimum Retained Limit" is defined as follows by the policy:

7. **Minimum Retained Limit** means the greater of:

   a. The total limits of any other insurance that applies to the *occurrence* which:

      (1)  Are available to a *covered person*; or

      (2)  Would have been available except for the bankruptcy or insolvency of the insurer providing the *underlying insurance*; or

   b. The **"Minimum Retained Limit"** amount shown in the Coverage Summary.

(Doc. 13, at 000122) (emphasis in original).

3

In addition, the Excess Coverage policy includes the following pertinent amendments and additional terms:

> **GENERAL PROVISIONS – OPTIONAL EXCESS LIABILITY COVERAGE ENDORSEMENT**
>
> Except for the **Definitions** section and items modified by specific reference in the following provisions, the coverage provided by this endorsement is subject to the terms and provisions found in the policy's **"INTRODUCTION"** and **"GENERAL PROVISIONS"**. The following are in addition to those terms and provisions and apply to only the **"OPTIONAL EXCESS LIABILITY COVERAGE ENDORSEMENT"**.
>
> \* \* \*
>
> 7. **Other Insurance**
>
>    Only in regard to the coverage provided by this endorsement, the **Other Insurance** provision of the policy's **"GENERAL PROVISIONS"** is deleted and replaced by the following:
>
>    When there is other applicable insurance, we will provide coverage as follows:
>
>    \* \* \*
>
>    b. During the first and subsequent years of this policy, when an amount of "Optional Excess Liability" is shown effective in the Coverage Summary, the coverage provided by this endorsement is excess over any other valid and collectible insurance *except*:
>
>       (1) When other insurance is written specifically as excess coverage over the minimum retained limit, we will pay only our share of the loss. Our share is the proportion that our limit of "Optional Excess Liability" bears to the total of all applicable limits.
>
>       (2) When other insurance is written specifically as excess coverage over the amount shown in the Coverage Summary for "Optional Excess Liability", we will pay amounts due

    above:

    (a) The *minimum retained limit*;

    (b) The **Self Insured Retention**; or

    (c) The **Excess Loss Assessment** threshold;

    up to our "Optional Excess Liability" limit.

(Doc. 13, at 000129-30) (emphasis in original).

  Notably, the USP Deluxe Package, in which the Excess Coverage is included, provides automobile insurance, homeowner's insurance and optional excess coverage over both the homeowners and automobile coverage. (Doc. 13, at 000034.) Further, the Excess Coverage provides $2.5 million in extended coverage for a low premium of $289 for the two vehicles listed on the policy and $68 for the residence. *Id.* Finally, as noted in the policy language, the insured is required to maintain underlying insurance for each exposure covered by the Excess Coverage. (Doc. 13, at 000123).

## PROCEDURAL BACKGROUND

  On May 17, 2004, Casey White filed a civil action against Michael Ahearn and the Eulers. (Doc. 13, at 000012.) Following commencement of the civil action, Continental tendered the entire $250,000 in primary coverage. The circumstances of the accident and the injuries of Casey White, however, are such that the parties have stipulated that the civil action has a value in excess of $250,000. (Doc. 12 ¶ 10.) Therefore, on June 15, 2004, Plaintiff filed a Declaratory Judgment Action in the Court of Common Pleas of Lackawanna County, seeking a determination as to which carrier must provide the next layer of coverage. Great Northern removed the action to this Court on July 14, 2004.

(Doc. 1.)  On September 10, 2004, Continental and Great Northern filed Cross Summary Judgment Motions.  (Docs. 14, 16.)  Oral Argument on these Cross Summary Judgment Motions was held before the Court on January 25, 2006.  Both motions are fully briefed and ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56©.  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one.  *See id.* at 248.   An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law.  *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient

showing of an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *See Anderson*, 477 U.S. at 256-257.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

Continental argues that its policy is an umbrella policy and, as such, Great Northern's policy must be exhausted before Continental is required to pay. Great Northern argues that Continental has failed to make a clear and unequivocal expression of its intent in the policy, and that any ambiguity in the policy must be construed against Continental following the Pennsylvania Supreme Court's decision in *Harleysville Ins. Cos. v. Aetna Cas. & Sur. Ins. Co.,* 795 A.2d 383 (Pa. 2002). Continental counters that *Harleysville* has not superceded, and in fact recognized, the reasoning in the United

States Court of Appeals for the Third Circuit's decision in *Occidental Fire and Casualty Company v. Brocious*, 772 F.2d 47 (3d Cir. 1985).  The parties agree that Pennsylvania law applies in this case.

**1.    Interpreting Insurance Contracts: *Brocious* and *Harleysville***

The general rule for interpreting insurance contracts in Pennsylvania is the following:

> When interpreting an insurance policy, a court must ascertain the intent of the parties as manifested by the language of the written agreement.  When the policy language is clear and unambiguous, the court must give effect to the language of the contract.

*Harleysville Ins. Cos. v. Aetna Cas. & Sur. Ins. Co.,* 795 A.2d 383, 386 (Pa. 2002) (citing *Travelers Cas. & Sur. Co. v. Castegnaro*, 565 Pa. 246, 772 A.2d 456, 459 (Pa. 2001) (citations omitted).  In order to discern the parties' intent, a number of courts have looked "not only to the language of the policies, but also to the design of the policies."  *Id.*

Umbrella policies are policies that are designed to be "sold at comparatively modest prices to pick up where primary coverages end in order to provide extended protection."  *Id.* at 53.  Some of the indicia of an umbrella policy include: low premiums for a large amount of coverage, policy language that designates the excess nature of the policy, and a requirement that the named insured maintain underlying primary insurance.  *See id.* at 54; *Aetna Casualty & Surety Co. v. United Services Auto. Asso.*, 676 F. Supp. 79, 81 (E.D. Pa. 1987); *Chester Carriers, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 767 A.2d 555 (Pa. Super. 2001); *Harleysville,* 795 A.2d at 386.

In *Occidental Fire and Casualty Company v. Brocious*, 772 F.2d 47 (3d Cir. 1985),

the Third Circuit Court of Appeals recognized that "[a] number of cases [had] given effect to the different language of the umbrella policy and its underlying purpose by holding that primary policies or policies with excess clauses must be exhausted before the carrier of an umbrella policy is required to pay." *Id.* at 54.  The court furthered noted:

> Because such policies are not an attempt by a primary insurer to limit a portion of its risk by labelling it "excess" nor a device to escape responsibility, they are regarded as a "true excess over and above any type of primary coverage, [or] excess provisions arising in regular policies in any manner. . . ."

*Id.* at 53 (citations omitted).  The *Brocious* decision also predicted that Pennsylvania would adopt the same reasoning.  *Id.*

The Supreme Court of Pennsylvania did not address the issue until *Harleysville Insurance Companies v. Aetna Casualty & Surety Insurance Company,* 795 A.2d 383 (Pa. 2002).  In *Harleysville*, the court was faced with three insurance policies that were in effect at the time of the accident.  *Id.* at 384.  The three policies included: (1) a "Personal Auto Policy" issued to the vehicle owner by Pennland Insurance Company, (2) a "Personal Blanket Excess Liability Policy" issued to the vehicle owner by Harleysville, and (3) a "Personal Auto Policy" issued by Aetna to the mother of the driver involved in the accident.  *Id.*

Harleysville argued that its policy was an umbrella policy and should be regarded as true excess over the Pennland and Aetna policies, which Harleysville asserted were policies that generally provided primary coverage but contained "excess clauses" that allowed their coverage to become excess only because of the presence of a non-owned vehicle.  *Id.* at 385-86.  Aetna countered that the unique language of the Harleysville

9

policy made it excess only over primary insurance.[1]  *Id*. at 386.  The court determined that the language in the Harleysville policy did establish that the policy was excess only over primary insurance and, therefore, concluded that the Harleysville policy must be exhausted before the Aetna policy; which contained no limiting language.  *Id*. at 387-88.  The Supreme Court of Pennsylvania explained:

> We would agree that the Harleysville policy does contain some of the indicia of. . . [an umbrella] policy. . . .Yet the standard for interpreting insurance policies does not allow us to focus solely on the nature of the policy and ignore the plain meaning of the policy terms.  To the contrary, 'the polestar of our inquiry. . . is the language of the insurance policy.'

*Id.* at 286-87 (quoting *Madison Construction Co. v. Harleysville Mutual Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (Pa. 1999).  The court further stated:

> Harleysville relies on several cases which reviewed. . . [umbrella] policies and concluded that those policies were not triggered unless other available coverage had been exhausted.  *See, e.g., Chester Carriers, Inc., supra; Occidental Fire & Cas. Co. v. Brocious*, 772 F.2d 47 (3d Cir. 1985); *Aetna Cas. & Sur. Co. v. United Services Auto. Ass'n*, 676 F. Supp. 79 (E.D. Pa. 1987).  In each of those cases, the courts considered both the language and the nature of the policy.  However, we do not reach the same result as in those cases **for the simple reason** that the "other insurance" provisions in those policies did not specify that coverage was excess only over "primary insurance", as does the Harleysville policy.

---

[1]  The "other insurance" clause in the Harleysville policy stated:

> The insurance afforded by this policy shall be excess insurance over any valid and collectible *primary insurance*, whether or not shown in the Declarations.

*Harleysville,* 795 A.2d at 385 (emphasis added).

*Harleysville,* 795 A.2d at 387 (emphasis added).

The Court interprets the holding in *Harleysville* to establish that when the language of a policy is clear and unambiguous, the Court must give effect to the language of the policy even where the language negates the policy's espoused nature and design. However, the decision in *Harleysville* does not require that the language of a policy establish a clear and unequivocal expression of the parties' intent in order for that intent to be given effect, nor does it prevent the Court from looking to both the nature and language of a policy in order to determine the intent of the parties.

### a. Continental's Policy

Great Northern, relying on *Harleysville,* would have the Court construe any ambiguity in Continental's policy against Continental.[2]  As noted previously, the Court does not interpret the decision in *Harleysville* to require that the language of a policy establish a clear and unequivocal expression of the parties' intent in order for that intent to be given effect.  *See, e.g., Aetna*, 676 F. Supp. at 81 ("Admittedly, the language of the. . .[umbrella] policy could more clearly state its true excess nature.   . . .Nevertheless, this deficiency does not change its true nature as an umbrella policy.")  In order to ascertain the intent of the parties the Court will consider both the nature and the language of Continental's policy.

---

[2]  The Court notes that the general maxim that "ambiguous terms in a policy are to be construed strictly against the insurer and in favor of the insured" is inapplicable in the present case; which involves two insurers.  *See, e.g., Aspplundh Tree Expert Co. v. Pacific Employers Ins. Co.*, No. 90-6976, 1992 U.S. Dist. LEXIS 19171, at *34 (E. D. Pa. Dec. 9, 1992).

### i. Nature & Design

The nature and design of Continental's policy indicates that it is an umbrella policy. Particularly, Continental's policy contains many of the indicia of an umbrella policy. Notably, the Excess Coverage provides $2.5 million in extended coverage for a low premium (Doc. 13, at 000034), it is labeled "Optional Excess Protection" and provided under an endorsement entitled "Optional Excess Liability Coverage Endorsement" (Doc. 13, at 000121), and the insured is required to maintain underlying insurance (Doc. 13, at 000123).  Therefore, as long as the language of Continental's policy supports a determination that the policy is an umbrella policy and does not clearly negate the policy's nature, the policy will be considered to be true excess over Great Northern's policy in order to effectuate the intent of the parties.

### ii. Language

Great Northern, correctly, points to language of Continental's policy that is difficult, cumbersome, and unclear.  However, Great Northern has not identified language within Continental's policy that clearly negates the policy's nature as an umbrella policy. Specifically, Great Northern points to two areas of the Continental policy: the definition of "Minimum Retained Limit"  and the "other insurance" clause.

#### (1)  "Minimum Retained Limit"

Continental argues that its policy expressly states that any payment is subject to the "Minimum Retained Limit" and, therefore, the policy is not triggered until Great Northern's policy is exhausted.  Great Northern argues that the definition of "Minimum Retained Limit"  in Continental's policy cannot serve as a mechanism to create priorities

12

among excess carriers.  Further, Great Northern asserts that the "NOTE" provision of the Limit of Liability clause indicates that the "Minimum Retained Limit" is inapplicable because the limit was fully "satisfied" through the insured's maintenance of their underlying primary insurance policy.  Continental argues that the "NOTE" provision, when analyzed in context with the entire policy, is clearly a statement clarifying only that the insured will satisfy any obligation to maintain underlying insurance when the insured maintains the underlying insurance through Continental's package.  The "Limit of Liability" and "NOTE" provision of Continental's policy read in relevant part:

> **Limit of Liability**
>
> You must maintain *underlying insurance* for each exposure shown in the Coverage Summary for "Optional Excess Liability", with not less than the liability limits shown in the *Minimum Retained Limit* definition.
> \*   \*   \*
> NOTE:  The *Minimum Retained Limit* will be satisfied in regard to any exposure(s) for which you maintain the *underlying insurance* as part of [the Continental Policy] with which this endorsement is issued.

(Doc. 13, at 000123) (emphasis in original).  "Minimum Retained Limit" is further defined by the policy as follows:

> 7.    . . . the **greater of**:
>
>   a. The **total limits of any other insurance that applies** to the occurrence which:
>
>     (1)   Are **available** to a covered person; or
>     \*   \*   \*
>   b. The "Minimum Retained Limit" amount shown in the Coverage Summary.

(Doc. 13, at 000122) (emphasis changed).  Although the term "Minimum Retained Limit"

13

is difficult and cumbersome, there is nothing within the usage or definition of the term that would contradict a finding that the true nature of the policy is that of an umbrella policy. Namely, "Minimum Retained Limit" is defined as "the greater of" two options, one of which can be defined as the "total limits of any other [available] insurance." *Id.* Understandably, Great Northern also argues that its policy is not "available" because it is excess over any insurance. Continental, however, counters that Great Northern cannot avoid its payment obligation by arguing its policy is not available until after Continental's umbrella policy is exhausted. Although the term "available" is not defined in Continental's policy, a plausible definition would include Great Northern's policy. Taken into account with the nature of Continental's policy, this language can be viewed as supporting a determination that Continental's policy is an umbrella policy.

### (2) "Other Insurance" Clause

Great Northern next points to Continental's "other insurance" clause. The clause reads in pertinent part:

> 7. **Other Insurance**
>    \*   \*   \*
>    When there is other applicable insurance, we will provide coverage as follows:
>    \*   \*   \*
>    b. During the first and subsequent years of this policy, when an amount of "Optional Excess Liability" is shown effective in the Coverage Summary, the coverage provided by this endorsement **is excess over any other valid and collectible insurance**. . . .

(Doc. 13, at 000123) (emphasis changed).

Great Northern argues that a plain reading of the "other insurance" clause indicates

that three conditions must exist for its coverage to be excess.  Namely, there must be other "applicable" insurance, the other insurance must be "valid", and the other insurance must be "collectible."  Great Northern contends that none of these three conditions exist in the present matter because Great Northern's policy is excess over any insurance and, therefore, is not "applicable" or "collectible".  In response, Continental argues that the "issue implicated by an 'other insurance' clause is not whether the policy is valid, collectible, or available, but simply an issue of priority of coverage among other valid, collectible and available policies."  (Doc. 19, at 13.)  The terms "applicable", "valid", and "collectible" are not defined in Continental's policy.  Although the "other insurance" clause could be more clearly stated, Continental's articulation of the clause is plausible.  Further, the clause does not contain any language that would clearly contradict a finding that the true nature of the policy is that of an umbrella policy.

Continental's policy language is difficult, cumbersome, and unclear.  However, there is no language in the policy that clearly negates a determination that the design and nature of Continental's policy is that of an umbrella policy.  Further, the language of the policy supports the conclusion that the policy is an umbrella policy.

### b.     Great Northern's Policy

Great Northern's policy is a primary automobile insurance policy which provided $500,000 of initial liability coverage.  In addition, Great Northern's policy had an "Other Insurance" provision that states:

> **Vehicles:** When other liability insurance applies to covered damages, we will pay our share. Our share is the proportion that the amount of coverage under this policy bears to the total of all applicable amounts of coverage. However, for non-owned motorized land vehicles, this

> insurance is **excess over any other insurance**, except that written specifically to cover excess over the amount of coverage in this policy.

(Doc. 13, at 000206) (emphasis added).  Although the language in Great Northern's policy clearly establishes that the policy "is excess over any other insurance", the policy does not contain any indicia of an umbrella policy.  *Id.*  Continental's umbrella policy can be true excess even over another excess policy, such as Great Northern's policy.  *See Brocious*, 772 F.2d at 53-54.  Therefore, in order to give effect to the umbrella nature of Continental's policy, Great Northern's policy must provide the next layer of coverage and be exhausted before Continental's policy is required to pay.  As such, I will grant Continental's Motion for Summary Judgment (Doc. 14) and deny Great Northern's Motion (Doc. 16).

## CONCLUSION

The Court interprets the holding in *Harleysville* to establish that when the language of a policy is clear and unambiguous, the Court must give effect to the language of the policy even when the language negates the espoused nature of the policy.  However, *Harleysville* does not require that the language of a policy establish a clear and unequivocal expression of the parties' intent, nor does it prevent the Court from looking to both the nature and language of a policy in order to determine the intent of the parties.

Although Continental's policy language is difficult, cumbersome, and unclear; there is no language in Continental's policy that clearly contradicts a determination that the policy's true nature is that of an umbrella policy.  Rather, the nature and language of Continental's policy support the conclusion that the policy is an umbrella policy.

Continental's umbrella policy can be true excess even over another excess policy. Therefore, in order to give effect to the true nature of Continental's policy, Great Northern's policy must provide the next layer of coverage and be exhausted before Continental's policy is required to pay. As such, I will grant Continental's Motion for Summary Judgment (Doc. 14) and deny Great Northern's Motion (Doc. 16).

An appropriate Order will follow.


 February 6, 2006                                               /s/ A. Richard Caputo
Date                                                                    A. Richard Caputo
                                                                              United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CASEY D. WHITE, | |
| Plaintiff, | NO. 3:04-CV-1523 |
| v. | (JUDGE CAPUTO) |
| THE CONTINENTAL INSURANCE COMPANY, *et al.*, | |
| Defendants. | |

## ORDER

**NOW**, this    6th    day of February, 2006, **IT IS HEREBY ORDERED** that:

    A.    Defendant Continental Insurance Company's Motion for Summary Judgment (Doc. 14) is **GRANTED**.

    B.    Great Northern Insurance Company's Motion for Summary Judgment (Doc. 16) is **DENIED**.

    C.    The Clerk of Court shall mark this case **CLOSED**.


    /s/ A. Richard Caputo
    A. Richard Caputo
    United States District Judge